Gowen Investors LP, et al. Frucheretal v. Frucheretal, et al., number 07-3980, Mr. Miro, and Mr. Katzenberg. Take your time. Whenever you're ready. Thank you. May it please the court, my name is Stephen Miro. I'm here on behalf of McGowan Investors, et al., who are appealing at this point from a release issued by the Delaware Chancery Court purporting to bar their claims from proceeding in district court before this court. McGowan Investors and... I mean, the problem you're going to have, obviously, is you've got to be able to distinguish grimes, and what's your best argument for why we don't just simply follow what we did in grimes? Well, first of all, grimes didn't deal with the Private Securities Litigation Reform Act, and there are certain requirements in the Private Securities Litigation Reform Act which deal with the securities law claim... Counsel, excuse me. Sure. Ms. Fidler, I don't think you have the clock on. Thank you. Continue. Thanks, Mike. But in addition to that, going back to the origin of the constitutional foundations for having these nationwide class actions, which is Phillips Petroleum, and it was followed up, the open questions left by Phillips Petroleum were followed up in this court with the real estate title case, which was an antitrust case. It stated that when you bring parties... Well, actually, you're bringing claims in front of court. I mean, you're dealing with virtual representation, not really people in these class actions. And the claim that is being brought in front of the court, the due process that is required for each claim has to be calibrated  So in Phillips, they stated that when you bring in the claim and it's an out-of-state party, and then you're seeking to deal with the claim that doesn't have any contacts with the forum. You're losing me. Sure. I ask you, how do you distinguish this case from Grimes? And you say the PSLRA is a way to do so. The PSLRA is, in effect, a way of dealing with who represents the class... Yes. ...or wants to represent the class in a federal action. What's that got to do with distinguishing this case from Grimes? Well, Grimes said a state court could release federal claims. That was then followed up by Matsushita. Yeah. In other words, you can have a state court can release federal claims that on their own could not have been brought in the state court if you have a release that, in effect, covers them. Right. That was the subject matter jurisdiction that was really resolved with TBK way back when, the Second Circuit, that said the court can release claims that doesn't have the subject matter jurisdiction to entertain. But everything here seems... It's really, I mean, the process here is what? The mutualization of the exchange. Is that correct? Yes. And Ginsburg dealt with that concept, correct? No. It did not? No, it did not. And... Well, Ginsburg dealt with what? They didn't accept the archipelago bid? Well... And they went out to the strategic investors? Yes. They alleged two wrongs in the Ginsburg complaint, a breach of fiduciary duty by the board in making the sale to the strategic investors in the summer of 2005. But isn't this part and parcel of the whole thing, as Judge Ambrose says? I mean, none of these cases come out, unless you're dealing with the consequences of the demutualization issue. Aren't they all sort of under the same general fact pattern? Well... I mean, you have different theories. I understand that. And you can pick out different things. Well, I don't understand how it could be part of the same fact pattern because the demutualization claim dealt with the publication of the information memo in 2003, which is a transaction that occurred here in the Eastern District of Pennsylvania that caused, at that time in October 2003, people to forgo seeking their state law appraisal rights. Then, sometime later in 2005, you have a separate discrete transaction in which two wrongs occurred. So there's an intervening action at that point that cuts off any proximate cause chain. It's sort of like the case before this court, I think January 4th, David Maring, his receiver, this court discussed about how intervening actions can cut off a chain of causation. I don't see how you get from demutualization, which converted into a stock corporation, and then say it was inevitable. Wait a minute. The case you're talking about, the opinion that came out from our court on January 4th? Yes. That's really very different than this. Well, it dealt with the question of an intervening act causing a break in the chain of causation. Here, if you're saying it's a single fact pattern leading from demutualization to the wrongs committed. But the question is, if you have a broad release, which obviously is why these things settle if you're a defendant, what you're getting out of it is a release. Does that broad release cover the claims that you make with regard to the information memorandum and your claims under 10b-5 and 29b? And it appears that it's, when you look at the complaint in the federal action, you look at the complaint in the state action, they're pretty darn similar, except for the cover page. Well, I don't, if you look at the KBW complaint, which was... Well, KBW didn't help you. You've lost at the district court on that as well. That was pursuant to the release. It was barred by the release. And that was a standalone claim dealing with demutualization. So you... The point is, if you have a CLIAS action and you have a CLIAS representative, you have a CLIAS defined by people who own stock beginning April 20, 2005. My understanding is the starting point for a CLIAS action is you have to determine, first of all, if the named plaintiff can state a claim. If the named plaintiff can state a claim, then you can define a CLIAS that can proceed together on that claim. Now, this CLIAS, April 20, 2005, seriously can't be considered to hold the securities law claim from a transaction that occurred in October 2003. You have to be a buyer or seller of a security to hold a securities law claim. So the... Isn't your... The big point you're making is that you took... You came with a proposal to defendants to take the exchange that was 100% owned by plaintiffs and that they could do something that would put more money into people's pockets, and they had a proposal. And the proposal, they noted, would dilute the ownership interest. They ultimately were going to do a deal with Archipelago. They decided not to. They think that they thought they could sweeten the deal by doing it with strategic investors, and it appears that, in fact, they did sweeten the deal by dealing with strategic investors. And you're claiming somehow... What's the overarching claim? That somehow they lied to you in a way that caused you to relinquish your control and you didn't get what they said they were going to give to you, or what? Well, at the time of demutualization, the overarching claim is they lied to us as to the value of the exchange. The people did attempt to exercise their state law appraisal rights, but the informational memorandum misled them in a manner so that they were too late to exercise their rights. People actually went to Delaware but were told they were out of time at that time. But if that information memorandum was part of the process of demutualization... Yes. ...and when you opposed the matter before the Chancery Court, the court said that this is about demutualization, what did you not know then that you know now that was carved out from the release? I mean, it was pretty clear what the Chancery Court thought it was releasing. It's very clear what the Chancery Court thought it was releasing. I don't understand how it had the power to bind these persons on those claims that they held as to demutualization as opposed to the claims they held as to the breach of fiduciary duty that were alleged in the Ginsburg complaint. Help me. Sure. Do we really need to reach all these issues? I mean, it may be... You may think it's simplistic, but what the other side says, look, this is not a difficult case. The plaintiffs here appeared and argued before the Court of Chancery and also before the Supreme Court of Delaware and all of these issues, the same issues that they're trying to litigate here, and they lost, and that's it. Why are you not barred from having appeared generally in the Court of Chancery and litigated the issues of whether there was fair representation, class representative, class counsel, et cetera, et cetera, and having litigated the issue of whether the release was part of the same set of facts, I'm sorry, the federal claims were the same set of facts. Having litigated that and lost, how can you come in and re... You got another couple of bites at the apple here. What do you say to that? Well, first, that may be part of our federal system that it's set up, as Justice Ginsburg said, to provide for collateral attacks as to these releases, but going beyond that, McGowan Investors was not part of the parties that appeared in Delaware. And in addition, we have a situation where they obviously did hold claims as to the wrongs alleged in the Ginsburg complaint, so they were legitimately there for that particular thing. Just like as in real estate antitrust case, the Arizona school boards came before the Court of... Well, actually, it was the Arizona Attorney General, I think, for the school boards, came before the court and said, you're forcing us to appear here. We have monetary claims. We don't want to give up, and you're not giving us a due process. Now, here, this is not only the exception that was identified in the real estate antitrust, but here, some of these parties were actually defendants because the exchange imposed under its FLEX Rule 651 on those who were members of the FLEX, they imposed a liability. So not only did they lose monetary damages, but they had a liability imposed upon them, negotiated by Chuck Ginsburg, who was not a member of the FLEX, who could not have any standing on any claim a member had, had no financial stake in a number of the claims stated. Let's assume all of that's the case. Well, let's go back to Judge Stapleton's question, and with a bit of a lead-in. Ebony, why don't you add five more minutes, please? 1738 says that you look to state law with regard to the question of preclusion, and you, your folks were involved in the state law action. There is a question as to whether the release covers anything relating to demutualization. You bring up that argument to the Court of Chancery and to the Supreme Court. The Court of Chancery says that, indeed, it does apply to the whole process of demutualization. That's the process. It appears that you were there, you made your arguments, they were heard, and they were rejected. And federal courts look to state law for application of 1738. That's the way it works. Where was anything denied you that you otherwise could have gotten? Well, as a broad statement, that's correct as to 1738. However, when you have a clear sanction, according to Phillips Petroleum, and you bring people into a forum state that have no other contacts with that forum, then you have a choice of law question arises. Here, on the claims, demutualization, the federal securities law claims, those were all federal law claims, so there you don't even have a choice of law issue. It's actually federal law that applies. But here we have a putt to read. It's called Grimes. But Grimes didn't address it. Everything in Grimes arose out of a merger, and all the claims were from that. I understand that, but the point is that there were federal claims deemed to be released in Grimes by the state court, and the parties argued that they shouldn't cover that. They lost, and our court said, that's, in effect, game, set, and match. You were there. You had the chance to argue. Your arguments were heard, and they were rejected. Well, then you're saying there's no longer any way to preserve any claim that this court recognized a real estate title or that the Supreme Court recognized in England where due to the need to appear before a state court, they were allowed to reserve their federal law issues. So I don't think that there's a real conflict here, but I think these parties did all in their power to exercise their rights for a claim. They were legitimately before the Delaware Chancery Court on, and also attempt to preserve. They stated they wanted opt-out. They did not want to be in Delaware on these other claims. So the question really here is the power to bind on different claims, and do you have different measures depending upon the nature of the claim, and do you need, as the CLIA's representative, that CLIA's representative be qualified to represent different parties for each claim raised? Because obviously the whole CLIA's in Ginsburg had no stake whatsoever in the demutualization claims. They were people held as of April 20th stock in the FILEX. They couldn't be. But you made that argument to the court. Right. Correct. But trying to focus on the. I mean, haven't you had a forum to make these arguments before? Isn't that what Grimes and Dietrugs and even Nottingham case out of the First Circuit said? Well, I think. We're concerned you get a chance to argue these things. I understand that. The record's pretty clear you did get a chance to argue them. Well, there's a question of notice. I mean, you have that Supreme Court case, Jefferson versus, Richards versus Jefferson County, where you go in and hear what did McGowan and the others know was going to be decided by the Delaware Chancery Court. You had two wrongs alleged. There's a certain hydraulic pressure that courts have recognized occurs after a CLIA is certified. If we had known, if this was a reasonable expectation, as Justice Rehnquist pointed out in Phillips, petroleum, maybe we would have intervened at the CLIA certification set. Chuck Ginsberg's not really an adequate representative, and we would have gotten a hearing at that point. But the notice problem also kicks in. See, each of these claims, if you take the Delaware court's approach, your decision in Remington versus Manfredi is also wrong because that arose from the same evidence, course of dealings, et cetera, but you said the court had jurisdiction over the contract claims but not over the defamation claims. So there's a clear conflict here between federal and state law. These parties had no contact with Delaware other than the case that they were non-opt-out, pulled into, two wrongs alleged by Chuck Ginsberg. Maybe we're ending up where we started. I asked you how you would distinguish this from Grimes, and you said that it dealt with the PLS LRA. And, in effect, you're saying that Mr. Ginsberg wasn't the correct person to act as a representative of the class, and, in fact,  Is that what you're saying? Well, I think under the PSL LRA there's a requirement if you want to represent a class in a case that's been brought under the federal rules of civil procedure, as was the case here, that you have to apply to the court of which the case is pending. Here he was representing a settlement class, and they did a total end run around that. And that implicates an important federal policy procedure. I mean, the Securities Litigation Uniform Standards Act was enacted to sort of put an end to state courts doing this end run around the PSL LRA. But the PSL LRA doesn't repeal the Full Faith and Credit Act, does it? I think the two things can work in tandem. The Delaware court could have said to Chuck Ginsberg, we're authorizing you to go to the district court and tell them, well, you have it settled, and these are the terms. And then maybe my clients would have gotten the information that they told the Delaware chance report they were entitled to for a settlement of a case brought under the Private Securities Litigation Reform Act. They didn't get that. I think the question, at least the question as I heard it, said do you really think there was a congressional intent when they enacted the I think there's an overlap between the two. I don't think they were thinking about amending it. And I think with the enactment of the Securities Law Uniform Standards Act, they were looking to actually eliminate that question. So there wouldn't be any overlap. Here you have what's called a non-covered security in any event. So it wouldn't have been covered. But sometimes laws do overlap. And when they overlap, how do you resolve them? And here the more important policy, which Congress and all the courts of appeals have recognized, as well as the Supreme Court, is they wanted to deal with a person owning one share of stock controlled by their attorneys doing these securities law class actions.  We'll get you back up and rebuttal. Mr. Katzenberg. Good morning, and may it please the Court. My name is Steven Katzenberg. I represent the exchange defendants, and I'm arguing on behalf of all defendant appellants. The Ginsburg action dealt with the end of the demutualization process, and it looks like this case deals with the beginning. I would respectfully disagree with that, Judge Ambrose. Both cases dealt with the entire process. If you look at the amended complaint in this action, what the plaintiffs argue in that complaint is essentially that there was a tripartite transaction that consisted of demutualization, the strategic investments, and a self-tender that was offered by the exchange in connection with the strategic investments time-wise, and that those three together created some unified transaction that violated Rule 10b-5. If you look at the beginning of the history of these cases, that is simply emphasized. Both cases began eight days apart in June of 2006. Both cases included allegations with respect of all the transactions that I just mentioned. Both cases sought as their remedy rescission of the stock that was provided, conveyed to the strategic investors. And both cases also began with a TRO request, resulting in hearings and a ruling by the district court here and by the chancery court. And the TRO was to bar and prevent the back end of the strategic investment transactions, which was the exercise of a warrant by the strategic investors. So the very first thing that was going on in this case was a request for a strategic investment stock and a TRO seeking to prevent the fulfillment of the strategic investment transactions themselves. Now that issue as well, Your Honor, as the panel has pointed out, was in fact very actively litigated as part of the settlement process. And the Delaware Chancery Court and the Delaware Supreme Court both explicitly addressed the issue of the similarity between the two losses. The Delaware Supreme Court said demutualization was both the subject of intensive pretrial discovery. The chancellor held that the demutualization claims, quote, arose out of the common nucleus of operative facts. And the chancellor commented that he heard countless arguments about such claims and discovery disputes and emotion practice and was confident they're properly encapsulated under Delaware law by the scope of the release. The fact is that while this case brought an improvident federal securities claim, which was denied, which was dismissed on the merits of that claim under Rule 12B6, the Delaware case moved forward with very extensive discovery. 750,000 pages of documents were produced. Dozens and dozens of depositions were taken. And that matter only settled on the very eve of trial after a mediation by Vice Chancellor Lamb, who was not the sitting chancellor. Their argument, I hear them at the beginning arguing that Ginsburg, in effect, as their brief says, provides a roadmap for how to get around the requirements of the PSLRA. Do you want to address that? Sure. I don't believe that that's correct, Your Honor. If the PSLRA, first of all, the standard for an implied repeal, which is the legal question, is there an implied repeal of the full faith and credit is extraordinarily high. There has to be an irreconcilable inconsistency between the PSLRA and the full faith and credit act. And in addition, normally that would have to be expressed. I mean, to have it implied would be extraordinarily difficult. And when you look at the, if you're going to look to imply, you look to congressional intent. And this court in La Sala, a case in which Judge Amber, you sat on that panel. And additionally, the Supreme court in tell labs both explicitly found that the purpose of the PSLRA was to discourage frivolous litigation by plaintiffs and plaintiffs counsel. And in fact, to put in place impediments to frivolous securities litigation moving forward. So the very congressional purpose of the PSLRA and followed up by Slusa was to prevent, to create impediments to frivolous securities litigation moving forward. There's nothing inconsistent with that and allowing resolution, appropriate resolution in the state court of claims that encompass federal securities claims. As this court in Grimes has said, it's not to Sheeta has said. So there's no inconsistency whatsoever. I mean, I think part of the part of the argument is that you're taking a federal claim under 10 B five and 29 B and you're for lack of a better determinate or lack of a better description. You're litigating it at a distance, but you're not litigating it at a distance. There was a different theory. There was in fact a theory that a state law theory, common law theory that led to a resolution. I mean the district court in this case has already said, had already said that the, that the legal theory presented here was not a valid one. I mean, this was not, you can't look at the Delaware case and in any sense get the feeling of some color of an end run, which is, which was a concern in the real estate title services case. For example, there was some concern about whether there was an end run. I mean, this is a case where you went through, as I already said, the massive discovery, there was very, very substantial compensation provided and consideration provided in the settlement. There was an incredible abundance of process that was offered in connection with the settlement. I mean, the McGowan plaintiffs, I heard my colleagues say something about McGowan investors not participating as an objector. Of course, all you have to do is reference the supplemental appendix. Each plaintiff here did participate extensively. They submitted a 41 page brief identifying their objections. They received documentary discovery, the very lengthy pretrial briefs. They were heard at argument. One of the plaintiffs here was one of the appellants to the Delaware Supreme Court. And that was all just on the initial approval of the settlement. Then there was a question of an, of an allocation of that settlement. And again, that allocation addressed all of the McGowan plaintiffs, active involvement and, and objections. And they ought to argue their case about the value that should be ascribed to an already dismissed federal court claim that was on appeal, their case. So your, your honor, I mean, there is no basis to say that the full faith and credit act has been, uh, impliedly repealed by the PSLR in this case. And what you have is, uh, simply a proceeding where there was an excess of an excess of procedure. The McGowan plaintiffs had every opportunity to pursue all of the objections. They raised the exact same objections in the Delaware court that they were raised here. They were explicitly ruled upon, uh, and, and the substantive, the substantive issues raised by the plaintiff appellants here were in fact addressed by the Delaware courts. Thank you very much. Thank you. Your honor. Mr. Miro. Uh, first, just to correct the record, McGowan investors was never a party in Delaware. Other of the plaintiffs were parties, did appear in Delaware, but McGowan never did, uh, in Grimes versus Vitalink. Wait a minute. I don't, help me with that. Sure. They didn't appear. They did appear and they argued. No, McGowan never appeared in Delaware. To object? Never appeared to object, never participated in Delaware at all. Uh, who did object? Timothy, Tim Loback, and Stephen Chesildine, Market Street Investments appeared. Is, is that one of the? They, they were. You represent them, right? Yes. Yeah. Yeah. All, all four were the moving, well, the, uh, plaintiffs here in the Eastern District of Pennsylvania. McGowan made a determined choice that appearing in Delaware was a waste of time, and he never appeared. He was, he never authorized anybody to represent him in Delaware, had no appearance in Delaware whatsoever. So, it's sort of like in Grimes with, uh, Grimes and Holbrook. But, setting that aside, uh, in, in Grimes versus Vitalink, the district court did make findings about, did have a hearing and make findings about due process. Even though it felt that those claims were meritless, it did proceed to conduct an evidentiary hearing. Uh, no hearings has taken place here, and the question is, is this, uh, collateral attack open? Uh, many courts of appeals, I think there's a list in Wilford versus Transamerica Second Circuit case, and Brown versus Tycor, they allow collateral attacks where, uh, under certain circumstances. But, but, but in the end, in the end, this is a full faith and credit case, and is there some exception that you can hang your hat on that wasn't, isn't foreclosed by our precedent in Grimes? And, I guess we've dealt with that during the, uh, extensive. Well, uh, unless you remand for a hearing on whether they received adequate due process, which they claim they did not receive given the nature of their claims, that they were also subject to liabilities, which is more than the school board. But, but that's what I think we dealt with pretty extensively during your opening. Uh, yes. So there's, uh, I don't think anything, uh, other than the fact that when you talk about the necessity of a, uh, repeal, I don't think it's actually requires a necessity repeal. I mean, there's cases where statutes overlap, for instance, uh, with the National Bank Act. They said one statute was more particular than another. I think it was giving jurisdiction. So, you can give effect to both without one necessarily being repealed or impliedly repealed. And perhaps the two things have to be construed in harmony. And, uh, that's a question, I guess, for this court. Okay. Thank you. And thank you to both counsel for well presented arguments. We'll take the matter under advisement.